In the Interest of Kwasi M. Weibert. If the party is making an argument, please approach the podium and state your name and the party you represent. Hi. Good afternoon, Your Honors. My name is Kieran Weibert with the State Appellate Defender's Office. I'm here on behalf of Kwasi M. Assistant State's Attorney, Kathryn Scherr, on behalf of the people of the State of Illinois. Okay. Thank you. We've allotted 15 minutes for each side. The appellant can reserve five minutes for rebuttal. Thank you, Your Honor. I would like to do so. You may proceed. Thank you, Your Honors. May it please the Court, Counsel. I'd like to start, if I may, by just addressing a few things in this case that are undisputed. It is undisputed that the police illegally searched the cartilage of Kwasi M.'s home and that they illegally seized evidence therein, specifically some evidence found in a garage and in some trash cans. That issue has been resolved below and those items have been suppressed. Now, Your Honors, at the time that the police conducted this illegal search and seized this evidence, they knew two things. They had had an anonymous call from someone who reported seeing some people carry a television into a home. Beyond that, about roughly, I think, 40 minutes after that initial call came in, the time estimates were a little bit loose, but about 40 minutes thereafter, before they seized this evidence, they received a call from a man named Frank Post, stating that he had come home and discovered some items missing from his home, including a television. Now, Your Honors, prior to this search, during which they recovered some computer parts and most significantly, really, a passport with Frank Post's name on it, prior to that search, the police stood outside the house for 15 minutes at Kwasi M.'s house. They didn't ring the doorbell. They didn't knock on the door. They didn't shout at the windows. They didn't try to reach anybody on the phone. They made no attempt to contact anyone. And that remained true when they got this call from Frank Post that there had been a burglary in the area. They did not try to contact anyone in the home. They did not try to speak with anyone. They immediately went back. They searched. They seized. And then, when they had their hands on some truly incriminating evidence, at that point, they started making efforts to get ahold of somebody in the house. And, Your Honors, after that, of course, the police did eventually manage to reach Ms. Campbell on the phone. I believe a family member stopped by and asked her to come home. She did so. Detective Grossman spoke with her, and, in his words, he explained the situation and the case status to her. And then she was sent inside her home, and she came back out with a television and several of her children, including Ms. Kwasi M.'s. Did you say she was sent inside her home? By whom was she sent? By Detective Grossman. That's in the record? Yes, actually. She testified that she was sent inside the home? Well, there's a couple of points there. Detective Grossman at least implies at one point that he did actually request to search and was refused. He did tell her they were looking for a television. And, actually, at the motion to reconsider, defense counsel stated, and there was no opposition to the statement, no one disputed it, that Detective Grossman asked her to go inside and find the television. So Detective Grossman himself did not explicitly testify to that, but the statements were made. No one disputed it below. At that point, she went in. She came back out. She brought out Kwasi M. and his brothers. They were arrested. And a short time later, after he was held in custody, for I think it was about three hours, he gave an inculpatory statement. Now, Your Honors, another thing that's undisputed, or not particularly disputable in this case, is that the police relied upon the illegally seized evidence as part of their probable cause for arresting Kwasi M. We don't have to speculate about that. We don't have to infer it. Detective Grossman testified to it. He said he relied upon the totality of the circumstances, including the anonymous call, the report of this burglary at Frank Host's house, and the items that were recovered. Didn't he find some items in the garbage can, and isn't that abandonment? Well, Your Honor, I would respond to that in two ways. First, that issue was actually already decided below. The court found that those items were protected and suppressed those items because they were within the cartilage of the home. They were in a garbage can, but the garbage can was inside of the backyard. There is no they had to walk up the driveway, past the house, into the backyard to get to these things. So this was plainly the cartilage. The trial court found as much. And that issue hasn't been litigated here on appeal. The state hasn't argued that this court should somehow go back and reverse the trial court's suppression on those items. So at this point, we would say, A, no, that was not abandonment because it remained in private property within the cartilage of the home. But, B, at this point, that issue has already been addressed and hasn't at least to this point no arguments have been raised to that point. If that is something Your Honors are concerned about, then I could address it further. So, pardon me, I'm sorry. I'm a little congested, so I'll try not to do too much of that. So, Your Honors, really the first question that we come upon here is we're talking attenuation. So we're talking this television in particular to start. Was that obtained by exploitation of the initial illegal search, or was that obtained independent of the initial illegal search? And to that end, Your Honor, there are several points we need to pay attention to. The first, and we contend really the most significant in most respects, is that we have Detective Grossman's testimony. He went to Ms. Campbell. He explained to her the case status and the situation. Now, given what the police had at that point, only one significant thing had happened in the case status and the situation, and that was the discovery of these items and his passport of Frank Host. I mean, beyond that, we had an anonymous caller who saw some people carry a TV into a house, which isn't illegal. It's not suspicious. It's something that happens all the time. Other than that, the only thing they had was this report from Frank Host about coming home and finding some items missing, which did include a television. But to that point, Your Honors, we need to remember, what was the description we had of the television that this anonymous caller saw carried into this home? It was a television. That's it. Does Mr. Host happen to live in close proximity to where this is? Yes, Mr. Host lived down the street. I think it was on the same block. It was nearby. But, again, if we turn to this television that they saw being carried in, it was a television. It might have been a large screen television. We don't know if it was a tube TV or a flat screen. We don't know how big it was. Was it 40 inches, 60 inches? We don't know if it was in a box with a Best Buy sticker on it or if it was loose with wires hanging out of it. There is nothing to connect the basically absent description of this television that was carried into a home to the minimal description we have of Mr. Host's television, which was flat, large, and black, which in and of itself describes most of the television sold today. But it is at least somewhat of a description. We don't even have that of the item that was carried into the home. So at this point, essentially what the police have is a coincidence. And, Your Honors, we maintain that the only reasonable inference from this is the police knew that darn well because they didn't try to contact anyone in the home based on the anonymous call. They didn't try to contact anyone in the home based on Frank Host's call. They didn't try to talk to anyone, and they did not take any steps until they walked back in that yard, searched that garage, searched that cartilage, and found incriminating evidence. So, Your Honors, that point alone establishes a connection between those initially seized items and this television that was brought out. And once that connection is there, it's the state's burden to attenuate it, and they simply did not do it. And, Your Honors, we do, as we noted earlier, we do. Could you talk about the record with regard to what Grossman said to the mother? Yes, Your Honor. The specific, the explicit statement in the record was he explained to her the situation and the case status. In person? Yes. This is not the phone call? No. On the phone call, we don't, he didn't say anything about what he said on the phone. Ms. Campbell testified that he told her there were suspects in her house, and if she didn't come home in 15 minutes, he was going to kick the door down. But the testimony as to what was told her when she arrived was. Did Grossman refute that testimony? He didn't actually rebut it at all. He didn't mention it. He did not state what he told her on the phone. He didn't say he didn't say it. He didn't say that he did. So it is, as it stands, it stands unrebutted as far as the kicking in and the 15 minutes. What do we need to find to come to the conclusion that Officer Grossman did something that violates the Fourth Amendment with regard to the mother going into the home and bringing out a television? Well, Your Honor. Voluntarily, it does so, right? I assume you're suggesting to us that she did not do so voluntarily. Well, Your Honor. Oh, I'm sorry. But what does the record show that she did? Well, Your Honor, first of all, actually, we maintain that the question of voluntary or involuntary is a red herring in this case because we're not concerned with a violation of Africa Campbell's Fourth Amendment rights. We're not concerned. We're not trying to suppress a statement from her as involuntary. We're talking about attenuation. And in attenuation, the question is simply what did the police get to that item of evidence, independent of that initial illegal search and the seizure, the illegal seizure of that evidence, or by exploitation of that? Right. But, look, if the police had just stood there and Africa Campbell showed up, and maybe they didn't even call her, maybe she just showed up, she just came home from work, and they said, we're here investigating a burglary. She said, hang on a second. She goes in and comes back out with the TV and says, here you go. Oh, and here's my son who happens to match her description. I mean, if she did that surely voluntarily, I'm not saying that's our record, would you have a Fourth Amendment objection to this? Well, Your Honor, I think that's... If the answer is no, then what do you have to show to make it a Fourth Amendment? What does this exploitation have to look like? Well, Your Honor, I would come at that a little bit from two directions. I would say the scenario that you've proposed would certainly be on the outside edges here, and I think we would have to start asking questions. Because, for example, if you go back to a case like Wong Sung, sort of the seminal case, some of the evidence that was suppressed, there doesn't appear to be any doubt that the person that they ultimately got that evidence from voluntarily allowed them to search his home. But they never would have been there, and they never would have known to look for evidence there had they not previously illegally arrested someone and gotten statements from them. And so much the same here, one of the first questions we have to ask is, are the police even talking to Africa Campbell if not for this illegally seized evidence? And the answer, based on the record in this case, is plainly no. Because they could have. They didn't. They could have tried to talk to someone in the house. They could have gone and investigated based on an anonymous call and based on this call from Frank Host, but they didn't do it. Instead, they waited until they acquired highly incriminating evidence, and then at that point they spoke with her. And so, Your Honors, we maintain that even that basic chain of events fairly clearly establishes a connection between these two things, at which point it's the State's burden to attenuate it. But, Your Honors, beyond that, as we said, when we talk about this, he explained the case status and the situation to her. It is certainly our position that there is only one rational interpretation of that, and any rational interpretation of that phrase has to include, by the way, we just found this incredibly incriminating evidence on your property. I mean, they want her cooperation. They want her to help them. They want her to do something for them. They want her to allow them to search her home or to go in herself, what have you. So, why wouldn't they? But if for some reason we could conclude or we could find that Ms. Campbell simply went inside the home, the police are there, she doesn't really, there is no explanation. We don't know what was included in the case status explanation. She just comes home, and the officers are there, and she simply sees them there. They offer some statement, some rationale, not necessarily coercive, and she simply volunteers to go in her house. And she finds a TV there that she didn't purchase. Do we have an issue? Well, Your Honor, again, I would reply to that twofold. One, I simply don't believe that's the record we have here, and I don't believe that that's a reasonable interpretation of Detective Grossman's statements. Second, I do think, Your Honor, that you're not required to ignore reasonable inferences and natural inferences that flow from the evidence here. And just the fact that the police are talking to her, and again, we maintain, the police wouldn't even be talking to Africa Campbell if not for finding this incriminating evidence. And so even if the police just go up and say, hey, here we are, we're outside your house. By the way, we're looking for a TV. Even at that point, we would maintain that there is a connection here, and that connection is what it takes to establish the beginning. And at that point, it's the State's burden to attenuate. But again, Your Honors, we don't believe that's the record we have here. We believe that the natural inferences from the record show that a mother is not going to go in her house looking for incriminating evidence and bring out her children to be arrested just because the police show up and say, hi, how are you doing? And we don't believe that a detective who's trying to induce cooperation from someone is going to withhold telling them, by the way, we have extremely damning evidence on your property. We think that all of the natural and reasonable inferences from the record lead to that conclusion. And, Your Honors, if I may, I would like to – I realize I'm – Counsel, they could have just asked for permission to search themselves, right? I mean – There's some indication in the record that they may have. Counsel and the State below both made an argument regarding the police asking to search and being denied permission. Now, I didn't see that in the testimony. Counsel below talked about it. And the police could have asked. We don't know specifically if they did because we don't have a lot of information from what Detective Grossman told us. But, again, we maintain that what we have is enough. And what we have clearly includes mentioning this illegally seized evidence. And clearly that is the motivating factor. That is the basis on which the police get access to this television. Can you address within the time remaining in your argument the issue with respect to the statement, the confession? Yes, Your Honor. I will. And I'll try to be brief because I know we're running short on time here. Well, first of all, Your Honors, we maintain that particularly once you have suppressed that television, there is no probable cause for Quassian's arrest. The police had nothing. They had a report of a burglary and the coincidental fact that some people brought a TV in the house. This is not probable cause. This is not even reasonable suspicion, especially given the lack of any kind of description that could tie the item seen to the item that was reported missing. Once we get to that point, Your Honor, at this point the question is simply, could that custodial statement taken a few hours later from a juvenile be attenuated from that illegal arrest and this illegally seized evidence? And to that point, Your Honors, the State has requested an attenuation hearing. We do object to that. First, because they've had two. There have been two hearings on this issue below. This statement was raised in both of those motions. It was alleged that this statement should be suppressed, and it was alleged that this statement should be suppressed in part because of that initial illegal search. And so if the State had evidence and argument to present on this point, they have had two opportunities to do so. And notably, here on appeal, the State has not actually made an attenuation argument. They have not said that they can attenuate this statement. They've just asked for the opportunity to do so. And, Your Honors, we would say that even leaving that aside, based on the record we have here, there is simply no reason to believe that you could attenuate this statement. We have a juvenile who was illegally arrested, based on illegally seized evidence, who was held in custody and then made a statement. So if we ask ourselves, if we go through the attenuation analysis, what could possibly happen here? He wasn't allowed to go home and then came back with his own free will. There wasn't any intervening probable cause. There wasn't any new evidence that the police could have confronted him with because we've seen everything they had. It was at the motion to suppress. It was at the trial. They did not have any other evidence other than this illegally seized evidence and the anonymous call. And, Your Honors, particularly when it gets to the TV, even if Detective Grossman did not say a word, even if he walked into the interrogation room and said, hi, do you want to say something to me, and Kwasi just started confessing, Kwasi knows they have the television. He was standing right there when they illegally obtained that television. And so at that point, he is already under the influence of that illegally seized evidence. And, Your Honors, we maintain that there is simply no basis to believe that you could possibly attenuate that statement from that illegally seized evidence and that illegal arrest based on the record that we have before us today. And given that this is a juvenile adjudication, Kwasi is due to finish his probation this month, if it hasn't already been terminated early. I haven't checked on that point. I probably should have. But at this point, he has been tried, he has been adjudicated on what everyone agrees was, at least in part, illegal police actions. We would ask this Court to simply outright reverse his adjudication. Counsel, let me ask you one more question. Yes. I'll try to be brief, too. You're saying the State had the opportunity to develop this record in the trial court and did not. So can you be more specific about that? There was a motion to suppress in the trial court. Yes. It was partially successful. Was there a motion to challenge the confession? Was that part of the suppression? Yes, Your Honor. First, the statement was part of that initial motion to suppress. Okay. And beyond that, then after that, there was a motion to reconsider the partial denial of that motion filed that explicitly targeted the statement and explicitly targeted the television and addressed those as needing suppression based, in part, on the fact that the initial illegal search and seizure had already been suppressed. Okay. And was attenuation discussed at all? Did the State argue it at all? The State did not argue attenuation particularly at that point. They could have. They didn't. They relied on a prior ruling and simply asked the Court to maintain its prior ruling, which the Court did. So I want to be clear with respect to any evidence that was adduced with respect to the custodial statement. Yes. There was an opportunity in the context of a hearing on a motion to suppress the confession? Yes, Your Honor. Now, I don't have the exact text of the motion directly in front. I may have some of it here. I'll take a look at it and give you the best answer I can on rebuttal. But the statement was raised in the motion to suppress, and it was very explicitly raised in the motion to reconsider. And so at the very latest, even if the State was not on notice to address this issue in that initial motion to suppress, it was very explicitly addressed in the motion to reconsider. And, again, we would note that even here on appeal, the State has not actually made an argument that they can attenuate these statements. And we don't believe that the record reveals any possibility that they could. So, Your Honor, as I said, I realize I'm out of time. So we thank you. And we would ask that you simply reverse Quasi's adjudication. Thank you. Thank you. Cheryl. Good morning, Your Honors. Again, I'm Assistant State's Attorney Katherine Sherrill on behalf of the people of the State of Illinois. May it please the Court. Counsel's attempt to paint the conduct at issue as a continuous course of conduct flowing from the already suppressed illegality should be rejected. The Fourth Amendment allows the fruit-of-the-poisonous-tree doctrine is not a but-for test. It allows for breaks in continuous course of conduct. So where was the break in this course of conduct? Well, the mom was intervening circumstance that presented independent probable cause to arrest defendant. How is it that the mom is back from wherever she was? I'm sorry? How is it that the mom is back? I think the mom was in South Island that morning? Yes. And something prompts her return? Yes. What prompts her return? Another family member arrived, and the police spoke to that family member, and that family member called the mom, and then Detective Grossman talked to her on the phone, and then she came back. So with her voluntary production, and voluntary in the sense that it wasn't the result of any exploitation of the already suppressed fruits of the illegal searches, and it wasn't a product of any threat to kick the door in or anything like that. It was voluntary in that sense. But as I said, the Fourth Amendment allows for breaks in the causal chain, and that's why we have these attenuation hearings, and we have doctrines like intervening circumstances, which is the mom's return and her voluntary act of producing the TV. But would they even have been there on the premises but for the first tip? I'm not sure how we even get them there, the law enforcement. Right. Well, prior to any illegality, Your Honor, the police did, contrary to what counsel thinks, they did have probable cause to believe that there was stolen property in the house. How is that? They had a call from the anonymous caller, which was reliable because ‑‑ So let me just stop you. So if you were carrying a TV into your house and someone called, that would be probable cause to think that you were illegally taking a TV? No, Your Honor, but the probable cause test is based on the totality of the facts and circumstances together as a whole. And those facts and circumstances that the police knew at the time of the arrest. So those facts and circumstances that they knew prior to any illegality are that an anonymous caller was reliable because the anonymous caller called and provided details that three or four people were seen taking a flat screen TV into the residence and gave descriptions of those people. While the police were standing there, prior to any illegality, the caller called back and said, you're at the right place, indicating that the caller was providing information based on personal observation. And again, prior to any illegality, the victim called and said that he had been gone for only 20 minutes, his house had been burglarized, he lived just a few doors down from Respondent, and his flat screen TV was missing. So the victim's call corroborated details in the anonymous caller's information that he provided. So then once they got the call from Mr. Host, is it? Yes. Even though they were on the premises based on an anonymous tip, once they got the call from Mr. Host, who had arrived home and discovered some items missing, couldn't they have simply gone and gotten a warrant? Sure they could have, Your Honor. They had enough to get a warrant, but they did not have to. It was perfectly constitutional under the Fourth Amendment to wait for the homeowner to come and to attempt to get their consent or cooperation, which is what they did here. So they did not need a warrant. And the facts, when you look at the facts and circumstances known to them as a whole, this is what they knew, that there was a short time period between when the victim left his house and the anonymous caller made the observations that people were carrying the TV into this residence. The victim's report that his home had been burglarized and his TV was missing during that short time period and the fact that the victim lived just a few doors down from the respondent, these facts are much more than just coincidental. Together as a whole, they established probable cause to believe that stolen property probably could be in that residence. And the police also had a lawful right, based on this independent probable cause, to believe that a crime had been committed. They had a lawful, well, in any event, they have a lawful right to approach a front porch and knock on the door and to talk to none. And when the respondent voluntarily walked out of his house, they had probable cause, and matched the description that the anonymous caller gave, they had probable cause to arrest him. How detailed was the description of the young respondent or the delinquent? How much description was in there? There's nothing in the record to explain what the description was, but from the fact that the police immediately arrested the respondent because he matched the description, and three other people came out and they also arrested them based on the descriptions. But the description, whether a respondent matched it or not, was never contested. So that record was never developed. So based on what is in the record, it's reasonable inference that he matched the description. So there was independent and prior to any illegality, there was probable cause to believe that stolen property was in the house. And when a respondent voluntarily of his own volition exited the house, matched the description, there was probable cause to arrest him. And his statement, based on that probable cause to arrest him, was properly admitted it was purged of any taint of the prior illegalities as in New York v. Harris, 495 U.S. 14-1990. It was untainted, purged, and it was voluntary. The statement was obtained at the police station, removed from the place of the original illegality. Respondent was Mirandez. He was 17 years old. His mom had an opportunity to accompany him, and she was notified but did not do so. And the caller has, I mean, the respondent has never claimed that it was involuntary. In fact, he refused to name his accomplices, indicating that his will was not overborne and that he was giving it by his own free will. Now, based on this independent probable cause, the trial court's ruling that denying the motion to quash arrest and suppress this statement should be affirmed. What was the evidence in Harris that led the court to find that it was attempted? The things you just said? They had prior probable cause to talk to the defendant, but they went into his house and illegally arrested him in a violation of patent. And so because they had prior probable cause, despite the illegality of the arrest, the statement was still properly admissible. So now turning to the – But here it wasn't that the arrest was improper so much as that the evidence that they had built up against him that he knew they had against him was, at least according to your opponent here, it was unconstitutionally gathered. So is that the same thing? That evidence has been suppressed. So the illegal – the evidence that was – But the TV hasn't been suppressed. Right. Now, the TV was proper. The trial court's ruling denying the motion to suppress the TV was also proper. It was not contrary to what respondent argues. Let me ask you this. What if we agreed with the defendant about the television, the respondent, about the television? Would that change your argument? Would you then concede that the confession must also have been? Or would you still argue? No, because what I just argued, that it's based on independent probable cause, independent of the TV, that they knew prior to any illegality, and they had probable cause to believe stolen property was in the house. And when respondent – they didn't violate any laws being on the front porch. When he walked out of his own volition, they had a right to arrest him based on that probable cause in the description in the anonymous caller's phone call. The defendant argues that the item was found in the garbage can where it was used as a leverage to coerce the cooperation of the parent. Right. Would that be like food of the poisonous tree when he uses that illegally seized evidence as a lever? Look, we found the victim's ID in the can, and we know this is what's been done. So can you bring me the TV? If that's what happened. But that's not what happened here. The claim that Detective Grossman confronted the mom with that illegally seized evidence is just based on speculation. Well, your identification is based on speculation. There's a lot of speculation here. Is the record sufficient here for us to consider this? Consider the independent probable cause. Those three factors that I delineated, those establish independent probable cause. That's a probability determination. Here, there's nothing in the record to support the claim that Detective Grossman confronted the mom with the – or exploited the illegally searched evidence. Did Grossman not have the materials, the documents and items that were in the garbage can? Or did he just leave them in the garbage can? When he went to the garbage can, he found things. The record's clear. He found things that had Mr. Hulse's name on them, which gave them reason, they believe, to confront the mom or to continue their investigation. They did find some things that matched the description of items described by Mr. Hulse. Right. So what did they do with them? They didn't bring them with them? They just stood on the front porch and waited for mom to come? There's no testimony or nothing in the record. That's pure speculation. We don't know what they did with it. So they should have just left if they found nothing, right? They did recover it, but there's nothing in the record to show that they confronted the mom with the illegally seized evidence. We can make certain inferences about what happened. Is it logical to conclude that they found evidence or they found materials in the garbage can that had the name of Mr. Hulse on it? And they get this call, as the record indicates, from a Mr. Hulse who says, I've been, you know, burglarized. Is it logical for us to believe that they then went, made the special walk to the side and the back of the house, found things with his name on it? Is it logical for us to conclude they just left those things there? And whatever was in the rafters? You know, Your Honor, they recovered it, but whether or not they confronted the mom with it, it's not based on anything in the record. They may have not wanted to confront her with it. We can't conclude anything because there's nothing to support such a conclusion in the record. Defense counsel below didn't even argue this claim that they used those fruits to confront the mom. He limited his argument just to the threat to kick the door in. And this is a claim made for the first time on appeal. But Detective Grossman testified that he told her about the situation and the case status. But when he was further... Well, Detective Grossman told us. He testified upon further questioning. He testified and clarified that he told the mom what information they had received from the anonymous caller, that they were looking for a large flat screen TV, and that that was the reason why they were there. All of this testimony in the record is what Grossman told the mom. And, in fact, Your Honor, the mom, who testified at the hearing, never testified that Detective Grossman confronted her with any illegally seized property. She testified that Detective Grossman told her there were suspects in her house and that she'd have to be home within 15 minutes or he would kick her door in. But the trial court rejected that finding, made a finding that she was not coerced. And it's not against... In the distress finding? Yeah. Specifically said? Yes. In the... It's really on the motion to reconsider. And that rejection of that claim is not against the manifest weight of the evidence because if you look at the conduct of all the parties involved here, it's clear that the mom's action of going in and getting the TV was voluntary on her part and not the product of any exploitation or coercion. The officers testified that after they knocked on the door, they saw someone looking out. But they just stood there and waited until the next family member arrived. They spoke to that family member. They didn't even ask for consent to search the home from that family member, who was an adult. And that family member called the mom, and then they spoke to the mom, and they waited patiently on the front porch another 15 minutes for the mom to arrive. When she did, they told her why they were there, what the caller told them, and that they were looking for a flat screen TV. And then they asked for consent to search her home. She refused. Now, this indicates that she was not feeling coerced or her will was not overborn. So what it indicates is when she refused, they go and get her more. Right? Sure. They went, but she refused, but they didn't need to because she went in and got the TV and brought it back out voluntarily. Obviously, she wasn't feeling coerced. Her actions are not the actions of someone who feels coerced or threatened by police. She even left the front door wide open while the police were standing on the porch. How many policemen were there in this one room? There were two police officers on the porch. There were not three. There were just two policemen and one woman. Two police officers. She felt fine. Yeah. Well, it's her neighbor. It's a couple doors down. Her son just stole her neighbor's TV. So when the door was left open, they didn't try to break the barrier or walk inside. They waited patiently again, and the mom just produced the TV. And then the respondent walked out of the house on his own volition. None of this conduct indicates that anybody coerced anybody. And the police conduct that I just delineated wasn't flagrant. In fact, the opposite is true. The mom's choice not to go to the police station further supports the conclusion that the police conduct wasn't flagrant and that it was reasonable. She wasn't concerned for respondent's safety. Well, now that's talking about her, but it's not her confession. It's that issue. It's her son's confession. This goes to whether there was a coercive atmosphere or whether she was acting voluntarily. So choosing not to go, she wasn't concerned with respondent's safety, and she obviously felt that the police were acting reasonably and that he was okay going with them without her. So where the mom wasn't coerced and the conduct wasn't flagrant, production of the TV provided intervening independent probable cause to arrest respondent and the trial court's motion to quash, denial of the motion to quash and suppress the statement, the TV and the statement should be affirmed. And the statement, yeah. Thank you. Based on these reasons and those in our briefs, this court to affirm the motion, the denial of the motion to quash, arrest and suppress the TV and statements. Thank you. Mr. Webber. And I will try to be reasonably brief. I believe a lot of these issues were addressed in our reply brief, so anything that I don't cover now hopefully is covered there. I'd like to address just a couple of things that are simply not true. First of all, that Detective Grossman clarified what he told mom and all he told her was this anonymous call in the report from Franco's. What Detective Grossman testified was, after initially saying, I explained the situation in case status, he then said, I explained the case status and I told her about what the anonymous caller said and this and that. This was not an exclusion. This was an adding to. He did not come up here and say, oh, all I said was this. He said, I said this and. So that does not somehow preclude the possibility that he did the most rational thing that any person in his position would do, which is mention the highly incriminating evidence he just got. And, Your Honor, just kind of moving on that point just a little bit. Pardon me. So if that record wasn't sufficiently developed, whose problem is that? Is that the state's problem or is that your problem? Well, Your Honor, I would respond to that in two ways. First of all, I would say that's the state's problem because we already have a connection. The mere course of the police conduct, the fact that they went back there, searched the house, obtained evidence, obtained more evidence, came back and then tried to talk with someone, then tried to contact someone, we maintain that alone establishes a connection. And once you have that connection, it's the state's burden to attenuate. And that didn't happen here. We would also maintain, however, as argued earlier, that we think this statement is entirely clear. It may not be great, and I suspect most of us, most of the time we read transcripts, could hope for a slightly better testimony than we got. But the case status in the situation, if that doesn't include that evidence that they just found, I don't know what. I don't know what it does include. And, Your Honors, to that point, there was a mention maybe he didn't want to tell her about this evidence. Well, Your Honors, unless the state is taking the position that Detective Grossman knew darn well that he had just illegally searched her property and taken possession of things he had no right to take possession of, why would he not want to tell her when he's trying to get her cooperation? Why wouldn't you tell her about this incredibly compelling evidence you have that is likely to induce her cooperation? It's simply not logical. Would you have the same argument if she had given them consent, unequivocally consent, to search the house after being presented with all this information? Yes, Your Honor. I believe if she had unequivocally consented after being presented with all of this illegally obtained evidence, yes, absolutely we would because that is still an exploitation of that initial illegality. She still is not giving that consent. They still are not getting that further evidence without that initial illegally seized evidence. And that is the essence of the fruit of the poisonous tree. And, Your Honor, there was a lot of talk about whether Kwasi matched the description from the anonymous caller, whether the anonymous caller was reliable. The anonymous caller saw somebody carry a TV into a house. They could have Kwasi's name. They could have his fingerprints and his DNA. That's not illegal. It's not suspicious. It doesn't matter how great that description is. We don't actually have that description. All we have is Detective Grossman's testimony that he matched certain aspects of that description. But, regardless, even if it was a perfect description, it's a perfect description of somebody doing something entirely innocent. That simply doesn't give you probable cause. And, again, the mere fact that there was a burglary around the area, around the same time, we have, as I said, I believe it's roughly a 40-minute time span between when this first call came in, when a neighbor felt compelled to report the fact that somebody was carrying the TV, and when this report of this burglary at Frank Host's house came in. This cannot be probable cause. This cannot even be reasonable suspicion. And we did cite to some cases, a case like People v. Clay, where you have very similar circumstances insofar as you clearly could put the defendant in immediate geographic and temporal proximity to a crime. But the mere fact that they were close by at the time that a crime happened, that doesn't give you probable cause. And the fact that they may have been doing something utterly innocent, in that case, walking down the street, in this case, carrying a television into your own home, that can't give you probable cause. And so this independent probable cause, it simply, it rests on speculation, and it rests on what is, in essence, coincidental. Your Honors, there was a reference that this was, this is being raised now for the first time on appeal. Your Honors, we don't agree with that. As noted, the motions addressed this statement. The motion to reconsider explicitly mentioned, among other things, it did mention voluntariness, it did mention coercion, which we agree was not really the correct issue. We think that's a bit of a red herring here. But it also referred to the fact, to these previously suppressed items, and argued that the statement should be suppressed on that basis as well. So this was raised below. It wasn't raised in great detail, but it was raised. And, Your Honors, I think that more or less addresses it. Again, I would, of course, refer to our briefs and the arguments made therein. And for the reasons we've discussed today and that are discussed in those briefs, we would ask this Court, if there are no further questions, we would ask this Court to reverse Guassi's adjudication. Thank you very much. Thank you. The case, as we all argued, well briefed. We will take the case under advisement and a decision will be issued in due course. Thank you.